**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHAWN L. SALYERS,

       Petitioner,

v.                                    Case No. 07-cv-10977

                                     HONORABLE STEPHEN J. MURPHY, III

LINDA M. METRISH,

       Respondent.

_____/

**OPINION AND ORDER**
**DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND**
**DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY AND AN**
**APPLICATION FOR LEAVE TO PROCEED _IN FORMA PAUPERIS_ ON APPEAL**

**INTRODUCTION**

Petitioner Shawn L. Salyers, a state inmate currently confined at the Newberry Correctional Facility[1] in Newberry, Michigan, filed a _pro se_ petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. On March 19, 2003, a jury in the Circuit Court for Jackson County, Michigan convicted Salyers of manslaughter, in violation of Mich. Comp. L. § 750.321. On April 30, 2003, he was sentenced, as a second habitual offender pursuant to Mich. Comp. L. § 769.10, to an imprisonment of no less than seven years and four months, and no longer than twenty-two years and six months. In his _pro se_ pleadings, Salyers alleges (1) that he was placed in double jeopardy in violation of the Fifth Amendment to the United States Constitution, (2) that the evidence was insufficient to support his conviction, (3) that

_____

[1] When Petitioner initially filed his habeas petition, he was incarcerated at the Hiawatha Correctional Facility in Kincheloe, Michigan.

the trial court improperly failed to instruct the jury that accident is a defense to manslaughter, (4) that the trial court also improperly failed give an involuntary-manslaughter instruction, and (5) that his sentencing was improper and that he was not informed of his habitual offender status.  Salyers also alleges ineffective assistance of counsel regarding issues one, three, and four.  Respondent argues in his answer that Salyers's claims lack merit or are procedurally defaulted because defense counsel failed to object.  For the reasons stated below, the Court denies Salyers's habeas petition.  The Court also declines to issue a certificate of appealability and leave to proceed on appeal *in forma pauperis*.

II.    Background

        This case arises from the November 10, 2002 death of Salyers's girlfriend, Kimberly Amyot.  Salyers was charged with first-degree murder, and as will be explained below, was tried twice.

        The facts that led to the charges are as follows: Salyers and Amyot got into an argument in Salyers's trailer home.  Amyot's two young daughters were watching television in Salyers's bedroom.  Amyot was intoxicated and had high levels of a sedative in her bloodstream.  During the argument, the girls heard their mother scream for help.  The argument became physical, and Salyers grabbed a vodka bottle and smashed it over Amyot's head.  Amyot warded off several blows, but Salyers swung the broken bottle at her, severing her jugular vein.  During the altercation, both Salyers and Amyot were seated on the couch.  Salyers did not call an ambulance for help.  Rather, he covered Amyot with a blanket.  He then told the girls to stay in the bedroom, left and went to a friend's house, where he smoked crack cocaine.  Subsequently, Salyers went to a relative's house, where

2

he was arrested.

After Salyers left the trailer, the girls came out into the living room and found their deceased mother. Hysterical and crying, they ran to a neighbor's trailer. The neighbor called 911 and took the children to another neighbor, who watched them until the police and protective services arrived. After Salyers was arrested, he admitted killing Amyot with the broken vodka bottle, though he denied killing her intentionally.

Salyers's first trial ended in a mistrial, after the prosecutor introduced, through a police officer, hearsay evidence that the parties had agreed would not be admitted. That occurred as follows. Two of the witnesses were Amyot's six-year-old twin girls, and the parties agreed, partly on defense counsel's suggestion so that the little girls would not have to testify, that Sergeant Michael Jester would testify from the police report as to what the children told the police about the incident. Nevertheless, the parties agreed that there were portions of the report that the officer could not testify to, and those sections were allegedly marked on the report.

Then, in response to a general question from the prosecutor, Sergeant Jester stated that the girls said "Oh, yeah, the girls said mommy screamed help three times." Trial Tr., 177, Mar. 3, 2003. That statement was one that was supposed to be redacted. The prosecutor agreed that the officer was not supposed to testify about the alleged screams for help, but suggested that it could be cured. The trial court disagreed: "Number one, he specifically was not to get into it. Number two, it's so prejudicial, I don't see how any curative instruction helps it at this time." Trial Tr., 179, Mar. 3, 2003. The prosecutor contended that the error was not intentional and failed to show manifest injustice. Defense counsel also acknowledged that neither the prosecutor nor the police sergeant intentionally

3

engaged in misconduct.  Defense counsel then requested a mistrial, which the trial court granted.  Salyers's retrial began on March 17, 2003.  Amyot's twin daughters testified at that trial.

At the second trial, Officer Rick Gillespie was first to testify.  According to Officer Gillespie, at approximately 7:00 p.m. on Sunday, November 10, 2002, he was dispatched to a mobile home park in Blackman Township, the home of Salyers.  Officer Gillespie testified that when he arrived at the scene, other officers were already present.  He said he saw Amyot lying on the floor in front of the couch, although he acknowledged that she was initially found sitting on the couch.  Officer Gillespie said that Amyot had a laceration to her throat and there was a large amount of blood.  He described a number of photographs of the scene, including photographs of Amyot.  He said the trailer was a complete mess.  A video of the trailer was both shown to the jury and described by the officer.

Officer Gillespie testified that no experts in DNA or fingerprints were called to the scene.  He said it was obvious to him that there had been a disturbance in the trailer; there was a dent in the wall, along with broken glass and numerous beer, liquor and prescription drug bottles throughout the trailer.

Officer Patrick Boulter testified next.  He was also dispatched to the scene, along with Officer French, who arrived separately.  He said that when he arrived, he saw a white female lying on a couch, with a large laceration to her neck.  According to Officer Boulter, he and Officer French did a sweep inside the trailer, looking for the assailant.  They then went back to the body and checked Amyot's vital signs.  Office Boulter said that he moved the body to the floor, repositioning Amyot, again checking her vital signs.  Not finding any signs of life, Officer Boulter said they then went outside, searching for the assailant.

4

Michael Wheaton, Salyers's neighbor, testified next.  According to Wheaton's testimony, on the evening in question he was watching television when he heard Amyot's little girls running back and forth in Salyers's trailer.  Wheaton said he twice heard the girls come to Salyers's front door, screaming, and then go back into the trailer.  After the second time, Wheaton said, he got up to see what was going on and again heard the girls come to the front door screaming.  This time, however, they ran out the front door and down the street.  Wheaton testified that at about the same time that the girls left the trailer, he witnessed Salyers also leaving the trailer on a bicycle.

Susan Leach, another one of Salyers's neighbors, also testified.  She said her neighbor, John LeFaive, brought Amyot's daughters to her trailer and asked if he could use the phone.  According to Leach, the girls were crying and said "Shawn murdered my mommy."  Trial Tr., 108, Mar. 17, 2003.  Leach said the girls stayed at her home until the police and protective services came to get them.

John LeFaive testified that he was leaving his trailer when he saw the twins standing outside his door, hysterically crying.  According LeFaive, they told him "Shawn killed my mother and there's blood all over the place."  Trial Tr., 116, Mar. 17, 2003.  LeFaive testified that, because his phone was not working, he took the girls to Leach's home and called 911.  LeFaive said the girls stayed with Leach until the police and protective services came and got them.

Britney Andrus, one of the twins, testified that she and her sister were watching television in Salyers's bedroom when she heard her mom call for help, about three times.  She said she did not hear any arguing before her mom yelled, and she didn't look into the living room because that would be "spying on people."  Trial Tr., 135, Mar. 17, 2003.

5

Britney testified that she suggested to her sister Kayla that they could go out there [to the living room] and bop Salyers on the head with a box.  She said Salyers told them not to come out or he would put them in the corner.  According to Britney, they went out soon after that and Salyers was not there.  She said they found their mother under a blanket on the couch; they moved the blanket to see her face, but according to Britney, their mother did not say anything.  Britney testified that she thought Salyers hurt her mother.  She said she and Kayla then left the trailer and went to a neighbor's to get help.

Kayla Andrus also testified.  She said that, on the night in question, she and Britney were watching television.  She said she heard her mom say "help" once.  Trial Tr., 152, Mar. 17, 2003.  Kayla testified that she heard Salyers say "[d]on't come out of the bedroom or I'll put you in the corner."  Trial Tr., 154, Mar. 17, 2003.  Kayla did not remember seeing her mother hurt.  She said that she did see her mother on the couch and saw blood.  Kayla testified that she did not see or hear anyone hurt her mother, but did remember seeing a broken mirror.  Britney and Kayla were in first grade at the time of the second trial.

Dr. Bernandino Pacris, a Deputy Medical Examiner employed by the Oakland County, Michigan, Medical Examiner's Office, performed the autopsy on Amyot.[2]  He said that she weighed 110 pounds, and was five feet five inches tall.  Dr. Pacris testified that he found six pieces of glass in her clothing and in her body, and that she had suffered a fatal cut on the front of her neck.  The wound was.  The wound three and a quarter inches in length and about one quarter to one-half inch deep – consistent with Amyot having been struck by a broken bottle.  Dr. Pacris testified that that wound injured the muscles and

---

[2]Dr. Pacris testified that, per contract, he also performed the autopsies for the Jackson County Medical Examiner's Office.

6

nicked the jugular vein. He said Amyot died of massive blood loss from that wound.

According to Dr. Pacris's testimony, Amyot might have survived with immediate medical treatment; without such treatment, she would have bled to death within a couple of minutes.  Dr. Pacris testified that there was also a one-inch abraded cut on Amyot's forehead, superficial scrapes on her back and shoulder, an inch cut on her right forearm, and bruises on the back of her left hand, which all could have been defensive injuries. There was also a laceration on the upper inner portion of the lip.  Photographs of Amyot were then displayed to the jury.

David Ewell, a Detective Sergeant with the Blackman Township Public Safety, testified next.  He said that he was called to the scene, and when he arrived, there were a number of police cars already there.  Detective Ewell testified that it was his job to secure the scene.  He said that because it was Salyers's trailer, he became interested finding Salyers, but that he did not actually come into contact with Salyers until he was at the police station, soon after his arrest.

After advising Salyers of his *Miranda*[3] rights, Detective Ewell, along with Director Finko, conducted an interview.  According to Detective Ewell, Salyers initially stated that he did not know what happened to Amyot.  Detective Ewell said that he then told Salyers (falsely) that one of the twins witnessed the assault.  He said Salyers then told him what had happened.

According to Ewell, Salyers stated that the unpleasantness began the Friday evening of that weekend, November 10, 2002, when Amyot became angry because he got

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

back to the trailer late that night.  Salyers told Detective Ewell that they argued; he said they drank and argued throughout the weekend.  Salyers also told Detective Ewell that Amyot was using drugs. According to Detective Ewell, Salyers told him that during that altercation, Amyot broke a mirror and several other items in the trailer.  Salyers said they were sitting on the couch, arguing, when suddenly Amyot bit his finger.  Salyers told Detective Ewell that he hit Amyot on the head with a vodka bottle, which broke, and then made a sweeping motion with the broken bottle.

Detective Ewell testified that Salyers then told him that he then covered Amyot with a blanket, washed his hands, changed his clothes, told the girls to stay in the room, and left the trailer.  According to Detective Ewell, Salyers told him that he first went to a friend's house, where he smoked crack cocaine, and that afterward, he went to his relative's house, Rebecca Collins's.  The police arrested Salyers while he was at Collins's house.

According to Detective Ewell, Salyers had injuries on his hand and right bicep, which Salyers said occurred when Amyot bit him and cut him with a piece of glass.  Photographs were taken of Salyers's injuries.  Ewell also testified that a significant amount of broken glass was found in the couch.  He said that Salyers told him that he didn't mean to cut or hurt Amyot, and that he did not mean to kill her.

Defense counsel was not allowed to ask Detective Ewell whether Salyers told him that he was defending himself or that it was an accident.  Even though Salyers wrote in his statement that he was in love with Amyot and was sorry, the Detective testified that he (Salyers) was not remorseful.

With that, the prosecution rested.  Defense counsel then motioned the trial court for a directed verdict on the first-degree murder charge, which was denied.

8

Dr. Michael A. Evans was first to testify for the defense.  He testified as an expert in toxicology.  According to Dr. Evans, Amyot's blood alcohol level was .18, and the alcohol content in her urine was .24.  He also said that she had a toxic level of the drug doxylamine, Unisom, a sleeping aid, and a near-lethal level of the barbiturate butalbital, a barbiturate used for migraines, in her system.  Dr. Evans testified that those drugs had an extreme cumulative effect, called "super addictive effects," which would cause Amyot to be unable to think rationally, release her inhibitions, exacerbate her underlying anger, and make her combative and aggressive.  Trial Tr., 23, Mar. 19, 2003.

Salyers's brother, Ricky Salyers, also testified.  He said that Amyot was his girlfriend before she became his brother's girlfriend.  He described her as an alcoholic and a violent, mean drunk.  He said that she would drink more than a half-gallon of vodka during a weekend.  She also smoked crack cocaine, marijuana, and abused prescription medication. According to his testimony, Amyot would tear things up, hit him, and throw things at him, causing him, at times, to jump out of a window to escape her attacks.  He said that he saw Amyot on Friday before the incident in question.  According to him, Amyot was angry at his brother and she was drunk.

Petitioner Salyers testified on his own behalf.  He said that he and Amyot were in love and about to be married.  Salyers acknowledged that they had problems the weekend of her death.  According to him, they drank, took prescription medicine, and smoked crack together, although he said that she was angry with him for bringing crack into the house because she wanted to quit.  Salyers said that Amyot also had trust issues and was angry with him because he came home late on Friday night.  He said that she was doing drugs and drinking heavily that weekend.  When he returned home on Friday, she had torn up the

9

trailer and broken a mirror and many of his things.

According to Salyers's testimony, Amyot continued breaking things and tearing up the trailer throughout the weekend. He testified that he slept almost all day Saturday, and when he woke up on Sunday, Amyot was still angry. He said they drank vodka and argued; she threw a bottle of beer against the wall and was yelling at him, not making any sense. Salyers said that, as they were sitting on the couch, she swung at him with a broken glass. He pushed her hand away and got cut; she also bit his finger. Salyers testified that he then grabbed a vodka bottle, hit her on the head, and the bottle broke. He said that she kept coming at him with the broken glass and he swung his arm to move the glass out of the way. According to Salyers's testimony, he did not realize that he still had the broken bottle in his hand. He said Amyot's neck was cut and she began bleeding profusely. According to him, he was in shock.

It was Salyers's testimony that Amyot stopped breathing after about a minute. He said he did not know what to do. He then covered her body with a blanket, told the twins not to come out of the bedroom, changed his clothes, washed off the blood, and left. He testified that he went to a friend's house, where he smoked crack. He said he knew the police would be looking for him. Salyers testified that he was arrested while at his cousin's house. He admitted that he was scared when he talked to the police. He said his written statement was a short, incomplete version of what had happened. Salyers testified that he did not intend to hurt or kill Amyot.

The jury was instructed on first- and second-degree murder, voluntary manslaughter, self-defense, and accident. The jury found Salyers guilty of voluntary manslaughter. At sentencing, the trial court stated that, after talking with the jury, "the jury had the same

10

feeling I did that this was virtually a second-degree murder case except it wasn't beyond a reasonable doubt." Sentencing Hr'g Tr., 12, Apr. 30, 2003. Nonetheless, the trial court indicated that it would not depart from the guidelines, and therefore imposed a minimum sentence at the highest end of the guidelines range–eighty-eight to two-hundred-and-seventy-months imprisonment.

Subsequently, Salyers filed an appeal of right in the Michigan Court of Appeals, raising the following:

I.      [Petitioner's] second trial and conviction violated his right to be free from double jeopardy where the prosecutor acted intentionally in causing the mistrial; defense counsel was ineffective in failing to object to the retrial. U.S. Const. amend. VI; Mich. Const. 1963, art. 1, sec. 15.

II.     The evidence was insufficient to support the charges of first-degree and second-degree murder and [Petitioner's] conviction must be reversed. U.S. Const. amend. XIV; Mich. Const. 1963, art. 1, sec. 17.

III.    [Petitioner] was denied his right to a properly instructed jury and his right to a defense by the trial court's erroneous instructions on accident; defense counsel's failure to object denied him his right to effective assistance of counsel. U.S. Const. amends. V, I, XIV; Mich. Const. 1963, art. 1, secs. 17 and 20.

IV.     The trial court reversibly erred by instructing the jury on voluntary manslaughter and omitting an instruction on involuntary manslaughter; defense counsel's failure to object denied [Petitioner] his right to effective assistance of counsel. U.S. Const. amends. VI, XIV; Mich. Const. 1963, art. 1, secs. 17 and 20.

V.      [Petitioner] must be re-sentenced where the [trial] court failed to address the prior conviction listed in the supplemental information [].

The Michigan Court of Appeals affirmed Salyers's conviction and sentence on February 15, 2005. *People v. Salyers*, No. 248540, 2005 WL 354598 (Mich.Ct.App. Feb. 15, 2005). The Michigan Supreme Court denied Salyers's subsequent application for leave

11

to appeal and his motion for reconsideration. *People v. Salyers*, 474 Mich. 1067, 711 N.W.2d 20 (2006); *People v. Salyers*, 475 Mich. 865, 714 N.W.2d 294 (2006).

On March, 7, 2007, Salyers filed this habeas petition. On March 26, 2007, he filed a motion to amend the petition, which was granted. (Dkt. ## 3, 4 and 7.) He raises the same issues in his amended habeas petition as were raised in the state appellate courts.

III.   Standard of Review

Habeas petitions filed after April 24, 1996 are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (April 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Salyers filed his petition on March 7, 2007, and his amended petition on April 9, 2007. Therefore, the AEDPA applies to his case. The AEDPA states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable

12

facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state-court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state-court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state-court decision, the standard set forth in §

13

2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

IV.   Discussion

    A.   Claims I, III and IV are procedurally defaulted

In his first claim, Salyers contends that the prosecutor acted intentionally in causing his mistrial, and therefore his retrial was a violation of double jeopardy. His third claim alleges that he was denied his right to a properly instructed jury and his right to a defense by the trial court's erroneous instructions on accident, and, in Salyers's fourth claim, he alleges that the trial court erred by instructing the jury on voluntary manslaughter and omitting an instruction on involuntary manslaughter. None of those alleged errors was objected to at trial and therefore are procedurally defaulted.

The doctrine of procedural default provides: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Application of the cause-and-prejudice bar may be avoided if a petitioner "presents an extraordinary case

14

whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994); *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001); *see also Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30. Finally, the state procedural rule must amount to an "adequate and independent" state law ground. *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). Whether the independent state ground is adequate to support the judgment is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

1.    Claim I – Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment "protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." *United States v. Dinitz*, 424 U.S. 600, 605 (1976). "As part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.'" *Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). Jeopardy attaches when the original jury panel is seated and sworn. *Crist v. Bretz*, 437 U.S. 28, 38 (1978). Once jeopardy attaches, a defendant may not be retried after a mistrial has been declared unless (1) there is a "manifest necessity" for a mistrial, or (2) the defendant either

15

requests or consents to a mistrial.  *Dinitz*, 424 U.S. at 606-07.

Salyers cites *Oregon v. Kennedy*, 456 U.S. 667 (1982) for support.  In *Oregon v. Kennedy*, the Supreme Court carved out a narrow exception to the rule that where the defendant moves for a mistrial, the Double Jeopardy Clause is not a bar to a retrial.  Under this exception, only if the conduct giving rise to the mistrial was prosecutorial or judicial conduct intended to provoke or "goad" the defendant into moving for a mistrial will double jeopardy bar a retrial.

In *Oregon v. Kennedy*, the defendant was charged and tried for the theft of an oriental rug.  At trial, the State's expert testified as to the value and identity of the property involved.  On cross-examination, the expert acknowledged that he had once filed a criminal complaint against Kennedy but explained that no action had been taken on his complaint.  On redirect, the trial court sustained a number of objections to the prosecutor's questions seeking to establish the reasons why the witness had filed a complaint against the defendant.  After eliciting from the witness that he had never done business with Kennedy, the prosecutor asked: "Is that because he is a crook?"  At which point the court granted Kennedy's motion for a mistrial.

On retrial, the court rejected Kennedy's contention that the Double Jeopardy Clause barred further prosecution of him finding that it was not the intention of the prosecutor in this case to cause a mistrial.  Kennedy was convicted but his conviction was reversed by the Oregon Court of Appeals which sustained the double jeopardy claim because it found that the prosecutorial misconduct that had occasioned the mistrial, even if not intended to cause a mistrial, amounted to overreaching.

The Supreme Court reversed holding that where a defendant in a criminal trial

16

successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for a mistrial was prosecutorial or judicial conduct intended to provoke the defendant into moving for a mistrial.  Since both of the courts below agreed that the prosecutor did not intend her conduct to provoke Kennedy into moving for a mistrial, the Court held that that is the end of the matter for purposes of the Double Jeopardy Clause.

Following the Supreme Court's decision, appellate courts, including the Sixth Circuit, have been very reluctant to find the intent necessary to satisfy the *Kennedy* standard.  *See*, e.g., *United States v. Thomas*, 728 F.2d 313, 318 (6th Cir. 1984) (no double jeopardy bar to retrial where the Court's "review of the record leads us to conclude that none of the prosecutor's behavior here will pass the intentional-goading-into-mistrial test of *Oregon*"); *United States v. Curry*, 328 F.3d 970, 973 (8th Cir. 2003) (district court's ruling that retrial was not barred following post-trial grant of defendant's mid-trial motion for mistrial upheld on the basis that, despite the prosecutor's withholding of material impeachment evidence and improper comments during closing argument, these actions were not an attempt to goad defendant into requesting a mistrial); *United States v. Gonzalez*, 248 F.3d 1201, 1204 (10th Cir. 2001) (government's appeal of the district court's grant of defendant's mistrial motion not barred because the government's intent in introducing allegedly prejudicial evidence may have been to obtain a conviction rather than a mistrial); *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001), *cert. denied*, 534 U.S. 894 (2001) (government's concealment of discoverable materials held not intended to provoke mistrial); *Greyson v. Kellam*, 937 F.2d 1409 (9th Cir. 1991) (no double jeopardy bar to retrial where misconduct showed the prosecutor's desire to convict, and not an intent to

17

goad defendant into moving for mistrial).

Addressing Salyers's double jeopardy claim, the last state court to issue a reasoned

opinion regarding that claim, the Michigan Court of Appeals, held that the claim was not

preserved for review because defense counsel waived a double jeopardy claim; he moved

for the mistrial and acknowledged on the record that neither the prosecutor nor the police

sergeant intentionally engaged in misconduct.  The state court of appeals stated:

> Defendant's first trial ended in a mistrial after a police officer disclosed a statement made by one of the victim's children.  The parties had agreed that the officer would not mention the statement during his testimony.  A copy of the officer's police report was marked to indicate those matters upon which he was permitted to testify and those that were forbidden; however, the actual report utilized by the officer was not marked, and he rendered testimony on a subject that was to be excluded.  Defendant subsequently moved for a mistrial, and the motion was granted.

> Defendant argues that his retrial was barred by double jeopardy and that counsel was ineffective by failing to object to the retrial.  Double jeopardy protection attaches when a jury is selected and sworn and is thus applicable before the conclusion of a trial. *People v. Dawson*, 431 Mich. 234, 251; 427 NW2d 886 (1988).  Where a trial ends before a verdict is rendered, such as where a mistrial is declared, the Double Jeopardy Clause may bar a retrial. *Id.*  A charged offense may be retried without offending the Double Jeopardy Clause where the mistrial was declared because of a hung jury, or where the prosecutor or judge made an innocent error or the cause prompting the mistrial was outside of their control. *Id.* at 252.  "Where the motion for mistrial was made by defense counsel, or with his consent, and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by defense counsel himself, retrial is also generally allowed, on the premise that by making or consenting to the motion the defendant waives a double jeopardy claim." *Id.* at 253.  If the defendant's motion for mistrial is prompted by intentional prosecutorial conduct, however, the defendant has not, by moving for a mistrial, waived double jeopardy protection. *Id.*

> Here, defendant waived a double jeopardy claim because defense counsel moved for the mistrial and acknowledged on the record that neither the prosecutor nor the police sergeant intentionally engaged in misconduct and, therefore, by doing so, intentionally relinquished a known right. *Id.* at 252-253; *see also People v. Carter*, 462 Mich. 206, 215; 612 NW2d 144

18

(2000).

> Yet, even if defendant had not waived the double jeopardy issue, it is without merit because the prosecution did not intend to provoke a mistrial or to create unfair prejudice. *Dawson*, *supra* at 251-252, 256-257. The record shows that the prosecutor did not know that the officer would testify in breach of the stipulation, and he certainly did not act with indifference as to whether the conduct would create unfair prejudice. There was no intentional prosecutorial misconduct. On such a record, the trial court did not commit error in finding no intentional misconduct by the prosecutor. Retrial was appropriate.

*Salyers*, 2005 WL 354598 at *1-2.

Salyers's double jeopardy claim does not entitle him to habeas relief for two reasons.

First, this issue has been procedurally defaulted: (1) the State has a regularly followed

procedural default rule which the petitioner did not meet, (2) the State actually relied on the

rule in denying the constitutional claim, (3) the rule was adequate and independent, and

(4) the petitioner does not show both cause and prejudice. *Lundgren v. Mitchell*, 440 F.3d

754, 763 (6th Cir. 2006). The Court finds that each of the four points has been met.

Michigan has a regularly followed rule that a party may not assert one thing at the

trial level and then something else on appeal. *People v. Carter*, 462 Mich. 206, 215, 612

N.W.2d 144 (2000). The Sixth Circuit has the same rule; a party may not agree with a

judge at the trial level and then claim error on appeal. *United States v. Aparco-Centeño*,

280 F.3d 1084, 1088 (6th Cir. 2002), *cert. denied*, 536 U.S. 948 (2002). Salyers did not

follow that rule. At trial, the following colloquy took place:

> MR. LADY [Chief Prosecuting Attorney]: I have nothing for that other than there's certainly no intention of mine –
> THE COURT: No, there was no intention.
> MR. DUNGAN [Defense Counsel]: I'm not – I'm not suggesting –
> THE COURT: Nor was there any intention on the Sergeant's part either.
> MR. DUNCAN: Right.

Trial Tr., 181-81, Mar. 3, 2003.

Moreover, the state court of appeals relied on that rule in denying relief.  It stated:

> Here, defendant waived a double jeopardy claim because defense counsel moved for the mistrial and acknowledged on the record that neither the prosecutor nor the police sergeant intentionally engaged in misconduct and, therefore, by doing so, intentionally relinquished a known right.  *Id.* at 252-253; *see also People v. Carter*, 462 Mich. 206, 215; 612 NW2d 144 (2000).

*Salyers*, 2005 WL 354598 at *1-2.  Salyers does not even claim that the rule is anything other than adequate and independent.

Second, Salyers cannot show both cause and prejudice.  Because Salyers requested the mistrial, his double jeopardy rights were violated only if he shows bad faith. *Tinsley v. Million*, 399 F.3d 796, 813 (6th Cir. 2005), *cert. denied*, 546 U.S. 1044 (2005). A State finding that no bad faith occurred is a factual finding.  *Id.*  Factual findings are entitled to a presumption of correctness that may not be overturned in habeas proceedings, absent clear and convincing evidence.  *Clark v. Waller*, 490 F.3d 551, 555 (6th Cir. 2007). Salyers fails to demonstrate the necessary clear and convincing evidence.

Even if the Court were to find that the procedural doctrine did not apply, Salyers's double jeopardy claim would be dismissed on the merits on the basis of *Oregon v. Kennedy*, because Salyers cannot establish that the prosecutor's behavior here will pass the intentional-goading-into-mistrial test of *Oregon*.  *Thomas*, 728 F.2d at 318.  In this case, defense counsel denied bad faith.  It was defense counsel who suggested that the Sergeant testify to the police reports.  Trial Tr., 179-80, Mar. 3, 2003.  The Sergeant's copy was not redacted.  *Id.*  Moreover, defense counsel acknowledged that the question that proceeded the answer was a "general question."  Thus, Salyers has failed to establish bad

20

faith, and he is not entitled to habeas relief on his double jeopardy claim.

Salyers asserts that his trial counsel was ineffective as cause to excuse his procedural default. That argument fails as well.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Strickland*, 466 U.S. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The Court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

Because Salyers's double jeopardy rights were not violated, the failure to request

21

a discharge is not deficient; defense counsel was not ineffective for not making a meritless objection. *United States v. Sanders*, 404 F.3d 980, 986 (6th Cir. 2005). Therefore, the Michigan Court of Appeals' conclusion that "[d]efendant's related claims of ineffective assistance of counsel fail because counsel was not required to pursue a futile position," is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Salyers*, 2005 WL 354598 at *2. Salyers is not entitled to habeas relief regarding this claim.

> 2.   <u>Claims III and IV – right to a properly instructed jury – trial court failed to tell the jury that accident was a defense to manslaughter and failed to *sua sponte* instruct the jury on involuntary manslaughter</u>

These claims are also procedurally defaulted. The trial court's instructions were as follows:

> First, when the Defendant acted, his thinking must be disturbed by emotional excitement to the point that a reasonable person might have acted on impulse without thinking twice from passion instead of judgment. This emotional excitement must have been the result of something that would cause a reasonable person to act irrationally or on impulse. The law doesn't say what things are enough to do this, this is for you to decide. Second, the killing itself must result from this emotional excitement. The Defendant must have acted before a reasonable time had passed to calm down and reason to – and return to reason. The law doesn't say how much time is needed, this is for you to decide. The test is whether a reasonable time passed under the circumstances of this case.

> * * *

> The Defendant says he is not [] guilty of any crime because Kimberly Amyot's death was accidental. By this, Defendant means that he did not mean to kill or did not realize that what he did would probably cause a death or cause great bodily harm. If the Defendant did not mean to kill or did not realize that what he did would probably cause a death or cause great bodily harm (sic). If the Defendant did not mean to kill or did not realize that what he did would probably cause a death, then he is not [] guilty of murder.

> The Defendant says he is not [] guilty of murder in the first-degree

22

because he did not intend to kill Kimberly Amyot. The Defendant says that his conduct was accidental. If the Defendant did not intend to kill Kimberly Amyot or cause a bodily injury that would lead to her death, then he is not [] guilty of murder in the first-degree. The Prosecutor must prove beyond a reasonable doubt that the Defendant intended to cause a premeditated [] murder or to cause bodily injury knowing it could create a high risk of death in order to convict of first-degree murder.

Trial Tr., 189-91, Mar. 18, 2003.

The Michigan Court of Appeals, the last court to issue a reasoned decision regarding this issue, stated:

Defendant next argues that the trial court improperly instructed the jury by failing to instruct them that, if the killing was an accident, they must acquit defendant of manslaughter or of any crime. However, not only were there no objections to the trial court's instructions, defense counsel said "No" when asked by the trial court whether there were any comments, corrections, or additions to the instructions. Thus, defendant has waived the issue for appellate review. *People v. Matuszak*, 263 Mich.App 42, 57; 687 NW2d 342 (2004). Defendant, however, also asserts ineffective assistance of counsel with respect to counsel's failure to challenge the instructions relative to the defense of accident. Voluntary manslaughter involves an intentional killing, and thus the defense of accident can be raised. *People v. Hess*, 214 Mich.App 33, 38; 543 NW2d 332 (1995). Accident is not a defense to involuntary manslaughter. *Id.* at 39. The trial court erred in Hess when the court instructed the jury that accident is not a defense to voluntary manslaughter. *Id.* at 38. Here, the trial court did not instruct the jury that accident was not a defense to voluntary manslaughter. Considering the jury instructions as a whole, they fairly presented the accident defense as applicable to voluntary manslaughter, thus sufficiently protecting defendant's rights. *People v. McLaughlin*, 258 Mich.App 635, 668; 672 NW2d 860 (2003). Furthermore, because the jury found defendant guilty of voluntary manslaughter, it necessarily found that defendant acted with an intent to kill. If the jury had concluded that defendant's act was accidental, regardless of the accident instruction, the jury could not have convicted defendant of voluntary manslaughter. Defendant's ineffective assistance of counsel claim also fails for failure to establish prejudice.

*Salyers*, 2005 WL354598 at *3.

And, regarding the trial judge's failure to *sua sponte* instruct on involuntary manslaughter, the Court of Appeals stated:

23

Defendant next argues that the trial court committed error warranting reversal when it failed to charge the jury with an instruction for involuntary manslaughter. Defendant waived this issue for appellate review when trial counsel affirmatively stated that he had no comments corrections, or additions regarding the instructions. *Matuszak*, *supra* at 57. Once again, however, defendant presents an accompanying ineffective assistance of counsel argument.

To establish the crime of involuntary manslaughter, the prosecutor must prove beyond a reasonable doubt that the defendant acted in a grossly negligent, wanton, or reckless manner, so as to cause the death of another. *People v. Moseler*, 202 Mich.App 296, 298; 508 NW2d 192 (1993). Involuntary manslaughter is the unintentional killing of another person, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or the negligent omission to perform a legal duty. *Mendoza*, supra at 536. Involuntary manslaughter, as well as voluntary manslaughter, are necessarily included lesser offenses of murder, and if a defendant is charged with murder, an instruction on involuntary manslaughter must be given if supported by a rational view of the evidence. *Id.* at 541.

We find it unnecessary to determine whether a rational view of the evidence supported an involuntary manslaughter instruction. Assuming that there was sufficient evidence to support an instruction, defendant fails to overcome the presumption that counsel's decision not to request an involuntary manslaughter instruction was a matter of sound trial strategy. *People v. Carbin*, 463 Mich. 590, 599-600; 623 NW2d 884 (2001). Counsel may have believed that he could convince the jurors that the killing was unintentional and that there was a lack of malice, thereby precluding convictions for the crimes of murder, first and second degree, and voluntary manslaughter, and he may not have wanted to allow the jury the "out" of finding defendant guilty of involuntary manslaughter in such a situation, thus forcing an acquittal. We are not prepared to find that counsel's performance was deficient.

*Salyers*, 2005 WL 354598 at *4.

The Sixth Circuit has the same preservation requirement for jury instructions. *United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2007).

Here, regarding Salyers's claim that the trial judge failed to instruct the jury that accident was a defense to manslaughter, Salyers fails to demonstrate that the verdict is

24

unreliable.  The trial judge did not incorrectly instruct the jury; he never said that accident was not a defense to manslaughter.  Rather, the trial judge specifically told the jury that Salyers defense was that he was not guilty, because it was an accident.  He then said that a person who does not realize that what he did would probably cause a death makes him not guilty of murder.  Thus, the Court concludes that the Michigan Court of Appeals' decision regarding this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Salyers is not entitled to habeas relief on this claim.

And, the same argument applies to Salyers's issue that the trial judge failed to *sua sponte* instruct the jury on involuntary manslaughter.  Procedural default applies; Salyers said that he had no objection to the jury instructions.  Thus, as the Michigan Court of Appeals stated: "Defendant waived this issue for appellate review when trial counsel affirmatively stated that he had no comments corrections, or additions regarding the instructions." *Salyers*, 2005 WL 354598 at *4.  Salyers is not entitled to habeas relief.

Salyers argues that trial counsel was ineffective for failing to object in both instances. Even if the Court were to find that counsel's performance was cause for the procedural defaults, Salyers nevertheless fails to establish that he was prejudiced by trial counsel's failures.  Salyers has not shown that any deficiency here undermines confidence in the jury's verdict.  *See* section A-1, *infra*.

Additionally, because Salyers failed to demonstrate cause to excuse his procedural default, this Court may not review the claims unless he can establish a constitutional error resulting in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

The Supreme Court has held that application of the "miscarriage of justice" exception

to the procedural default rule should apply only to cases where there is a likelihood of convicting a person who is actually innocent. *Schlup*, 513 U.S. at 321. " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. Salyers has not done so here. In fact, Salyers has pointed to no new evidence that the jury was not given. In this case, Salyers failed to demonstrate that a miscarriage of justice occurred on the basis of his actual innocence. Therefore, his procedural default will not be excused on this ground.

Moreover, even if these claims were not procedurally barred, they fail to state claims upon which relief may be granted. In order for habeas-corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002). Thus, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' can [the federal habeas] court grant a writ." *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005) (quoting *Kibbe*, 431 U.S. at 154). The Supreme Court noted in *Estelle* that "we also bear in mind our previous admonition that we 'have defined the category of infractions that

26

violate fundamental fairness very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Despite this difficult standard of review, a jury instruction will not withstand scrutiny if it submits alternative theories for the jury to convict, one of which is permissible and the other unconstitutional, and the reviewing court cannot determine on which theory the jury relied.  *Zant v. Stephens*, 462 U.S. 862, 880-83 (1983); *United States v. Palazzolo*, 71 F.3d 1233, 1235-38 (6th Cir. 1995).  If an instruction is ambiguous and not necessarily erroneous, it runs afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  *Estelle*, 502 U.S. at 72-73, n.4.  State law instructional errors rarely form the basis for federal-habeas-corpus relief.  *Id.* at 71-72.

Against that backdrop, the Court finds that Salyers is not entitled to habeas relief on these claims.

B.     Claim II – Insufficient evidence

Next, Salyers argues that the evidence was insufficient to support sending the charges of first- and second-degree murder to the jury.  The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358 (1970).  The issue before this Court is whether sufficient evidence was presented to the jury from which a reasonable fact-finder could find that the essential elements of the crime were proven beyond a reasonable doubt.

In resolving this issue, however, this Court is bound by two layers of deference to groups who may otherwise view the facts differently than the Court.  *See Saxton v. Sheets*,

27

547 F.3d 597, 602 (6th Cir. 2008).  First, as with all sufficiency-of-the-evidence-challenges, this Court must determine whether when "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In making this determination, the court does not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the trier of fact.  *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).  Therefore, even though the Court "might have not voted to convict a defendant had [it] participated in jury deliberations, [it] must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution."  *Brown v. Kontech*, Nos. 06-4037/4043, slip op. at 13 (6th Cir. filed June 2, 2009).

Second, if the Court finds that the evidence was insufficient to convict under *Jackson*, the Court must apply a second layer of AEDPA deference and determine whether the state appellate court was "objectively reasonable" in concluding that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *Saxton*, 547 F.3d at 602.  "The question 'is not whether a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"  *Knowles v. Mirzayance*, --- U.S. ----, ----, 129 S.Ct. 1411, 1420 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2005)).

The habeas court must review all of the evidence in the record and determine whether a reasonable jury could have found guilt beyond a reasonable doubt.  "The evidence must afford a substantial basis from which a fact in issue can reasonably be

28

inferred." *Spalla v. Foltz*, 615 F. Supp. 224, 227 (E.D.Mich. 1985) (citing *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985)).  As the *Spalla* court noted: "The prosecution need not negate every reasonable theory consistent with innocence."  *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307 (1979); *Holland v. United States*, 348 U.S. 121 (1954)).  In fact, "[a] conviction may be sustained based upon nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) (citing *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir.2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.")).

Here, Petitioner challenges the sufficiency of the evidence to support his first-degree and second-degree murder charges, specifically arguing that the prosecution failed to prove beyond a reasonable doubt the element of premeditation.  This Court must reject his challenge if, considering the evidence in the light most favorable to the prosecution, it concludes that a rational fact finder could have found that the elements of the crime were proven beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.  In making this judgment, this Court must bear in mind that the beyond-a-reasonable-doubt standard, itself mandated by the Due Process Clause, requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused [and] symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself."  *Id.* at 315.

This Court recognizes that the very existence of the *Jackson* test presupposes that juries accurately charged on the elements of a crime and on the strict burden of persuasion to which they must hold the prosecution, nevertheless may occasionally convict, even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt. This

Court assumes that judges may do so as well.  The test was adopted to provide an additional safeguard against that possibility.

The question before this Court in the instant case is whether the evidence, taken together and viewed in the light most favorable to the prosecution, could allow any rational trier of fact to conclude beyond a reasonable doubt that Salyers committed the elements of first-degree murder, specifically premeditation.  *Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998).  In conducting such an inquiry this Court considers all the evidence presented in the record.

Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable.  *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596 (E.D.Mich. 2001).  Moreover, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324.

Under Michigan law, the elements of first-degree murder are that the actor have an actual intent to kill, and that the intent must have been the result of premeditation and deliberation, rather than from a split-second, impulsive decision.  *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150 (1984).  In other words, first-degree, premeditated murder, the form of first-degree murder charged in this case, requires a finding that Salyers committed a homicide with premeditation and deliberation.  *See People v. Morrin*, 31 Mich.App. 301, 328, 187 N.W.2d 434 (1971).  "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem."  *Id.* at

30

329, 187 N.W.2d 434.   Under Michigan law, while the minimum time required to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469, 227 N.W.2d 535 (1975).   "[A]n opportunity for a 'second look' may be merely seconds, minutes, or hours, dependant on the totality of the circumstances surrounding the killing." *Hofbauer*, 159 F. Supp 2d at 596 (citing *People v. Berthiaume*, 59 Mich.App. 451, 456, 229 N.W.2d 497 (1975)).   "One cannot instantaneously premeditate a murder" in Michigan, and although premeditation and deliberation can be inferred from the circumstances of the homicide, they cannot be the product of speculation.   *People v. Plummer*, 229 Mich.App. 293, 301, 305, 581 N.W.2d 753 (1998).   As the district court noted in *Hofbauer*:

> The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. Premeditation may be established through evidence of the following factors:
> 1. the prior relationship of the parties;
> 2. the defendant's actions before the killing;
> 3. the circumstances of the killing itself;
> 4. the defendant's conduct after the homicide.

*Hofbauer*, 159 F. Supp 2d at 596 (quoting *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780 (1995)).

This Court concludes that the Michigan Court of Appeals' finding that the evidence was sufficient to support both murder charges was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.   Salyers's actions after the killing evince an attempt to cover-up his involvement in the crime; he cautioned the twins to stay in the bedroom, changed his bloody clothes, washed up, and covered Amyot with a blanket.   And, despite his theory that it was self-defense, he remained on the couch

during Amyot's alleged assaultive behavior, rather than getting off the couch and backing away from her.  Moreover, he struck Amyot on the head with the vodka bottle, smashing it, before executing the fatal swipe, thus evidencing a sufficient interval of time to reconsider his use of the weapon.  Additionally, that evidence also supports a finding of malice for the purpose of second-degree murder as well.

Against that backdrop, Salyers is not entitled to habeas relied on his insufficient evidence claim.


C.   Claim V – Improper Sentence

In his fifth claim, Salyers asserts that he is entitled to re-sentencing because (1) the trial court failed to address the prior conviction listed in the supplemental information, and therefore he had no knowledge of his habitual offender status, and (2) the trial court improperly sentenced him as if he had been convicted of second-degree murder.  Regarding these claims, the Michigan Court of Appeals stated:

> Defendant's final argument is that he is entitled to re[-]sentencing on multiple grounds.  Defendant is not entitled to re[-]sentencing for several reasons.  With respect to the argument that defendant's sentence should not have been enhanced under MCL 769.10, second habitual offender, defendant was provided proper notice that the prosecution sought enhancement as indicated in the felony information, and the court treated defendant as a second habitual offender, and found him to be such an offender, at sentencing after defense counsel specifically agreed that defendant had a prior felony conviction.  There was no claim that the notice was improper, nor any suggestion that defendant was not a second habitual offender.  The PSIR indicates that defendant had one prior felony conviction. MCL 769.13(5) provides that the trial court makes the determination whether a defendant is an habitual offender at sentencing, or at a separate hearing on the matter, and prior convictions can be established by any relevant evidence, including information contained in the PSIR.  This issue was effectively waived by defendant, and even if not waived, it is devoid of any merit.  On appeal, defendant does not deny that he has a prior felony

32

conviction.  Defendant is a second habitual offender, and there was no error.

> In regard to defendant's claim that the trial court, in determining the length of the sentence, improperly treated him as if he had murdered the victim, there is no basis for reversal.  The crime was committed in 2002; therefore, the legislative sentencing guidelines were applicable.  MCL 769.34(1) & (2).  The minimum sentencing range was 36 to 88 months, and thus the sentence issued by the court was within the range.  Pursuant to MCL 769.34(10), we are required to affirm a sentence within the guidelines range absent a scoring error or reliance on inaccurate sentencing information.  There is no claim of any scoring errors or inaccurate sentencing information.  Accordingly, we are mandated to affirm the sentence.  We conclude, after review of all the sentencing arguments presented by defendant, that there is no basis to reverse or vacate the sentence.

*Salyers*, 2005 WL 354598 at *4-5.

Regarding his habitual status, Salyers filed a written arraignment waiver.  In it, he specifically acknowledged his habitual-offender charge.  And, at sentencing, he also acknowledged that he would be sentenced as a habitual offender.  *See* Sentencing Hr'g Tr., 3-4, Apr. 30, 2003.

Also, a careful review of the record establishes that the sentencing court did not say that it believed that Salyers was guilty was of second-degree murder.  Rather, it said that, after having talked to the jury afterwards, it agreed with the jury that this was a borderline second-degree murder case, but that second-degree murder could not be found beyond a reasonable doubt.  Moreover, the Sixth Circuit has held that a judge may consider the facts underlying an acquittal in aggravating the sentence.  *United States v. Ward*, 190 F.3d 483, 492 (6th Cir. 1999).

Against that backdrop, Salyers is not entitled to habeas relief on his sentencing claims.

### D.   Certificate of Appealability

A petitioner must receive a certificate of appealability ("COA") in order to appeal the

denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §§ 2253(c)(1)(A), (B).  A district court, in its discretion, may decide whether to issue a COA at the time the court rules on a petition for a writ of habeas corpus or may wait until a notice of appeal is filed to make such a determination.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1072 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).  In denying the habeas petition, the Court has studied the case record and the relevant law, and concludes that, as a result, it is presently in the best position to decide whether to issue a COA.  *See Castro*, 310 F.3d at 901 (quoting *Lyons*, 105 F.3d at 1072 ("[Because] 'a district judge who has just denied a habeas petition . . . will have an intimate knowledge of both the record and the relevant law,'" the district judge is, at that point, often best able to determine whether to issue the COA.)).

A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In this case, the Court concludes that reasonable jurists would not debate the dismissal of Salyers's petition, and thus the Court will not issue a COA.  Nor should Salyers be granted leave to proceed on appeal *in forma pauperis*.  *See* Fed. R. App. P. 24(a).

V.   Conclusion and Order

For the reasons stated, the Court concludes that Salyers is not entitled to habeas corpus relief on the claims as outlined in the petition.  Accordingly, the Court **DENIES WITH**

34

**PREJUDICE** the petition for writ of habeas corpus.

      **IT IS FURTHER ORDERED** that the Court **DECLINES** to issue Salyers a certificate

of appealability and an application for leave to appeal *in forma pauperis*.

      **SO ORDERED**

                s/Stephen J. Murphy, III              
                Stephen J. Murphy, III
                United States District Judge

Dated:  October 7, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on October 7, 2009, by electronic and/or ordinary mail.

                s/Alissa Greer                  
                Case Manager